# EXHIBIT  1

James E. Hough (JH-1066)
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104-0050
(212) 468-8000

Robert H. Kreutzer (RK-1532)
7955 E. Chaparral Rd. Unit 110
Scottsdale, AZ 85250-7233
(480) 367-9073

Craig I. Celniker (CC-2352)
Shogo Asaji (SA-8547)
MORRISON & FOERSTER LLP
Shin-Maru Building 29th Fl.
1-5-1 Marunouchi, Chiyoda-ku
Tokyo, Japan 100-6529
(011-81-3) 3214-6522

Attorneys for Defendant
IHI Corporation

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **AVIATION CAPITAL GROUP CORP.** | Civ. No. 1:09-1077 (NRB) |
| *Plaintiff*, | **ANSWER AND** |
| | **AMENDED COUNTERCLAIMS** |
| vs. | |
| **IHI CORPORATION,** | |
| *Defendant.* | |

Defendant IHI Corporation ("Defendant" or "IHI"), by and through its

undersigned counsel, hereby answers the Complaint of Plaintiff Aviation Capital Group Corp.

("Plaintiff" or "ACG") dated February 6, 2009, and further asserts the following affirmative

defenses and counterclaims.

rk-325058

## ANSWER TO COMPLAINT

### Introduction

1.      Answering Paragraph 1 of the Complaint, Defendant denies the allegations of that paragraph, except admits that IHI is engaged, *inter alia*, in the business of repairing and overhauling jet aircraft engines, that ACG delivered to IHI a jet aircraft engine for repair, and that ACG's action purports to be one for a declaratory judgment seeking a judgment that ACG does not owe a certain sum to IHI.

### The Parties

2.      Answering Paragraph 2 of the Complaint, Defendant lacks sufficient information and belief to admit or deny the allegations in Paragraph 2, and on that basis, denies the allegations of that paragraph.

3.      Answering Paragraph 3 of the Complaint, Defendant admits the allegations of that paragraph.

### Jurisdiction and Venue

4.      Answering Paragraph 4 of the Complaint, Defendant admits the allegations of that paragraph.

5.      Answering Paragraph 5 of the Complaint, Defendant denies the allegations of that paragraph, except admits that the settlement agreement that ACG alludes to in that paragraph (the "Settlement Agreement") is attached to the Complaint as Exhibit A, and respectfully refers the Court to the Settlement Agreement for its terms and conditions.

6.      Answering Paragraph 6 of the Complaint, Defendant denies the allegations of that paragraph.

tk-325058

### Facts

7.    Answering Paragraph 7 of the Complaint, Defendant denies the allegations of that paragraph, except admits that the Settlement Agreement arose from a dispute over an invoice issued by IHI to ACG in connection with another jet engine repaired by IHI for ACG, and that Exhibit A attached to the Complaint is a copy of the Settlement Agreement, and respectfully refers the Court to the Settlement Agreement for its terms and conditions.

8.    Answering Paragraph 8 of the Complaint, Defendant lacks sufficient information and belief to admit or deny the allegations in the first two sentences of Paragraph 8, and on that basis, denies those allegations, except admits that on or about May 15, 2008, LTE International Airways ("LTE") delivered the engine identified in the Complaint as the "154 Engine" to IHI for repair and refurbishment.  Defendant also admits that IHI completed the work required to be performed on the 154 Engine on or about July 18, 2008, and that IHI sent an invoice to ACG for the amount of US$ 3,088,255 which ACG paid in partial satisfaction of the debts owing to IHI under the Settlement Agreement, and denies the remainder of the allegations of that paragraph.

9.    Answering Paragraph 9 of the Complaint, Defendant denies the allegations of that paragraph, except admits that ACG requested IHI to hold the repaired 154 Engine pending further direction from ACG.

10.    Answering Paragraph 10 of the Complaint, Defendant denies the allegations of that paragraph, except admits that during the approximate period that the 154 Engine was at IHI's repair facilities, IHI leased a spare jet engine to LTE with ACG's knowledge and consent.

11.    Answering Paragraph 11 of the Complaint, Defendant denies the allegations of that Paragraph, except admits that LTE failed to make certain lease payments to IHI, that on information and belief LTE is now insolvent, and that IHI is owed at least US$ 992,285 by LTE.

3

12.    Answering Paragraph 12 of the Complaint, Defendant denies the allegations of that paragraph, except admits that IHI claims that ACG has breached the Settlement Agreement and that ACG is liable for damages relating to such breach.

13.    Answering Paragraph 13 of the Complaint, Defendant denies the allegations of that paragraph, except admits that IHI requested ACG by a letter dated January 7, 2009 to pay US$ 992,285 excluding any interest, and that the letter is annexed to the Complaint as Exhibit B.

14.    Answering Paragraph 14 of the Complaint, Defendant admits the allegations of that paragraph, and affirmatively alleges that ACG has not paid the described sum.

15.    Answering Paragraph 15 of the Complaint, Defendant denies the allegations of that paragraph, except admits that IHI requested ACG in the January 7 letter to pay US$ 150,000 as liquidated damages pursuant to Clause 2 of the Settlement Agreement, and that ACG does not dispute that said sum is owing to IHI.

16.    Answering Paragraph 16 of the Complaint, Defendant denies the allegations of that paragraph, except admits that ACG has filed an arbitration proceeding in New York against IHI for the return of the 154 Engine and other related relief.

## RESPONSE TO PLAINTIFF'S FIRST CLAIM

17.    Answering Paragraph 17 of the Complaint, Defendant refers to and incorporates herein its responses to Paragraphs 1-16 of the Complaint.

18.    Answering Paragraph 18 of the Complaint, Defendant refers to and incorporates herein its responses to Paragraphs 11-12 of the Complaint.

19.    Answering Paragraph 19 of the Complaint, Defendant admits that ACG denies that it owes IHI the sum of US$ 992,285 under the Settlement Agreement or otherwise.

tk-325058

20.    Answering Paragraph 20 of the Complaint, Defendant denies the allegations of that paragraph.

21.    Answering Paragraph 21 of the Complaint, Defendant admits that ACG requests the Court to declare that ACG has no liability to IHI for the sum of US\$ 992,285 requested by IHI or for any other sums IHI may allege to be owed under its engine leases with LTE, but denies that ACG is entitled to such a declaration and denies the remaining allegations of that paragraph.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

22.    The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

23.    The Court lacks personal jurisdiction over Defendant.

### Third Affirmative Defense

24.    The process is insufficient.

### Fourth Affirmative Defense

25.    There was insufficient service of process.

### Fifth Affirmative Defense

26.    The Complaint fails to state an actual controversy.

### Sixth Affirmative Defense

27.    Plaintiff would be unjustly enriched if it were permitted to obtain any relief in this action.

tk-325058

### Seventh Affirmative Defense

28.     The claims asserted in the Complaint are barred in whole or in part by the doctrines of estoppel or unclean hands.

## COUNTERCLAIMS

29.     As and for its Counterclaims in the above-referenced action, Counterclaim-Plaintiff IHI hereby pleads as follows.

30.     Defendant and Counterclaim-Plaintiff IHI is a corporation organized under the laws of Japan with its principal place of business at Toyosu IHI Building, 1-1, Toyosu 3-chome, Koto-ku, Tokyo 135-8710, Japan.

31.     According to the Complaint, Plaintiff and Counterclaim-Defendant ACG is a Delaware corporation with its principal place of business in California.

### Jurisdiction and Venue

32.     This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1332. Counterclaim-Plaintiff is a citizen of Japan, and Counterclaim-Defendant is a citizen of a State. The amount in controversy exceeds US$ 75,000 exclusive of interest and costs.

33.     This Court has personal jurisdiction over Counterclaim-Defendant by virtue of its bringing this action and by virtue of the choice-of-forum provision in the Settlement Agreement, which provides that the parties "submit to the non-exclusive jurisdiction of the courts of New York to resolve any dispute arising hereunder."

34.     Venue properly lies in this judicial district by virtue of Counterclaim-Defendant having filed its Complaint therein.

tk-325058

**Facts Common to Counterclaim Counts I-IV**

35.    In 2004, ACG and IHI executed the General Terms of Agreement between ACG

and IHI No. ACG/IHI/V2500/01 ("the GTA", a copy of which is attached hereto as Exhibit 1), in

connection with the repair and overhaul of an IAE V2500-A5 airplane engine bearing

manufacturer's serial number V10035 for ACG.

36.    IHI overhauled, repaired and otherwise serviced the V10035 engine in full

compliance with the GTA in Japan, and on May 20, 2004, IHI duly issued Invoice

V10035ACG488-01, in the amount of US$ 483,617 that factored in US$ 800,000 that ACG had

pre-paid, in connection with its work. On November 17, 2004, IHI issued a revised invoice,

Invoice V10035ACG488-R1, in the amount of US$ 445,467.

37.    ACG disputed the amount it owed to IHI based on an unfounded warranty claim

allegedly stemming from previous maintenance work IHI had performed on the V10035 engine.

IHI denied ACG's claim and demanded full payment.

38.    That notwithstanding, on June 16, 2005, IHI and ACG entered into the Settlement

Agreement (annexed to the Complaint as Exhibit A).

39.    Without conceding any fault, IHI agreed in the Settlement Agreement to reduce

the balance payable on the outstanding invoice for the work performed on the V10035 engine by

US$ 500,000. In return, ACG agreed in Clause 2 of the Settlement Agreement to induct (i.e.,

place with IHI) three additional IAE V2500-A5 engines to IHI for "full performance restoration

and engine LLP [life-limited part] replacement" (that is, overhaul) within three years from the

date of the agreement. ACG further agreed that it would pay liquidated damages in the event it

failed to induct one or more of the three engines, in the amount of US$ 225,000 for the first one,

US$ 150,000 for the second one, and US$ 150,000 for the third one.

7

40.    In addition, ACG also agreed in Clause 3 of the Settlement Agreement to lease three engines as follows:

> During each of the three (3) engine shop visits committed pursuant to Clause 2 above, provided IHI has a leased engine available at the time each engine is inducted into IHI's facilities, IHI shall lease to ACG, and ACG shall agree to lease from IHI, such leased engines at competitive market rates and terms as then available in the leased engine industry. (Underline added.)

41.    The Settlement Agreement thus makes clear that ACG was obligated to provide IHI with revenue in the form of both engine overhaul fees and leasing fees, in return for a discount on the invoice that derived from the GTA.

42.    According to Paragraph 8 of ACG's Complaint, after ACG and IHI entered into the Settlement Agreement, ACG leased an Airbus A320-200 having a serial number MSN0580 to LTE International Airways from approximately May 16, 2006 through November 17, 2008. This aircraft was equipped with two IAE V2527-A5 engines with manufacturer's serial numbers V10155 and V10154 respectively, the latter being the "154 Engine."

43.    Sometime in 2007, on information and belief, ACG instructed LTE that the maintenance of the V10155 and V10154 engines should be performed by IHI. As a result, LTE contacted IHI for the first time in or around March of 2007, and the two negotiated as late as from November to December of 2007 regarding the repair and maintenance of the V10155 and V10154 engines. During this time, communications between ACG and IHI and, on information and belief, between ACG and LTE continued.

44.    On or around December 13, 2007, ACG forwarded a Purchase Order A00580-001 to IHI in connection with the repair and maintenance of the V10155 and V10154 engines. Attached as Exhibit 2 is a copy of ACG's purchase order. The V10155 and V10154 engines were the only engines to be inducted by ACG to IHI pursuant to the Settlement Agreement.

8

45.    On or around February 1, 2008, the V10155 engine was delivered to IHI in Japan from LTE in Cairo, Egypt for repair and maintenance.  A few days later, another IAE V2527-A5 engine having serial number V10080 was delivered to IHI in Japan from LTE in Cairo.

46.    The V10080 engine had been detached from an Airbus A320-200 having serial number MSN0496 that LTE was leasing from a company called International Lease Finance Corporation ("ILFC").  LTE also requested IHI to repair and overhaul the V10080 engine as well.

47.    IHI repaired and overhauled the V10155 engine and the V10080 engine, and on or around April 11, 2008, IHI had them shipped to LTE in Cairo.

48.    On or around May 15, 2008, LTE delivered the V10154 engine to IHI in Japan from Cairo for repair and maintenance.

49.    ACG never discharged its obligation to lease engines from IHI in connection with the induction of the V10155 and V10154 engines per the terms of the Settlement Agreement. This resulted in lost revenue for IHI.

50.    Knowing that LTE needed a replacement engine for the V10154 engine and in order to mitigate any further damages caused by ACG's failure to discharge its obligation, IHI on or around April 7, 2008 agreed to lease a replacement engine to LTE commencing April 30, 2008.  In order to make this possible, IHI in turn leased an IAE V2500-A5 engine having the serial number V12580 from a Swiss company called International Aero Engines AG ("IAE") in the U.K.

51.    On information and belief, leased engines were available for lease by IHI at all relevant times, including at the time of induction of ACG's engines into IHI's facilities, and IHI was ready and willing to obtain such leased engines and to sublease such engines to ACG.

9

52.     LTE, upon receiving the V10155 (ACG's) and V10080 (ILFC's) engines, placed both onto ACG's MSN0580 airplane, even though the V10080 engine originally came from ILFC's MSN0496 airplane.  On information and belief, this enabled LTE to fly ACG's airplane sooner and thereby generate revenue for itself without waiting for a replacement engine for the V10154 engine.  The delivery of the V12580 replacement engine to LTE was delayed a short while because ACG was late in paying the deposit for the repair and maintenance of the V10154 engine.  LTE eventually placed the V12580 replacement engine on ILFC's MSN0496 airplane.

53.     On information and belief, ACG was well aware that LTE was flying ACG's MSN0580 airplane using the V10080 engine in place of the V10154 engine and/or the V12580 replacement engine that IHI subleased to LTE.

54.     On and after June 16, 2008, upon the expiration of three years from the date of the Settlement Agreement, ACG was in breach of the Settlement Agreement for having failed to induct a third engine to IHI as required by Clause 2 of the agreement.  In accordance with that clause's liquidated damages provision, ACG immediately became obligated to pay IHI US$ 150,000 for its failure.

55.     ACG, however, has yet to make this payment even though more than eight months have passed since its breach and ACG has never disputed its obligation.

56.     The repair and overhaul of the V10154 engine was scheduled to be completed in mid-July of 2008.  However, on or around June 28, 2008, ACG contacted IHI and requested IHI not to release the V10154 engine once it is repaired to LTE without ACG's express approval.  On or around July 16, 2008, ACG again asked IHI to hold the V10154 engine in Japan and not to return it to LTE, which IHI agreed to do.

10

57.    On or around July 18, 2008, IHI completed the repair and overhaul of the V10154 engine. On information and belief, by that time and even earlier, ACG had become aware that LTE was in financial trouble, and ACG had become increasingly concerned that LTE might default on its lease and other payments to ACG in connection with ACG's MSN0580 airplane. LTE owed payments to IHI, and on information and belief, to various other entities as well, including ILFC. On information and belief, ACG was well aware of IHI's lease of a replacement engine for the V10154 engine to LTE.

58.    On information and belief, ACG asked IHI to hold the V10154 engine in order to withhold it from LTE and thereby pressure LTE into prioritizing its accounts payable to ACG over those of other entities such as IHI. On information and belief, this tactic paid off for ACG, which was able to collect outstanding payments from LTE and managed to terminate its airplane lease before LTE became insolvent at or near the end of 2008. By contrast, IHI was left holding the bag for at least US$ 992,285 and more that is owed by LTE in connection with the sublease of the V12580 engine.

59.    On information and belief, due to its financial troubles, LTE suspended all of its flights permanently on November 15, 2008.

60.    On or around November 26, 2008, ACG for the first time asked IHI to return the V10154 engine.

61.    ACG alleges in Paragraph 16 of its Complaint that IHI refused to return the engine to ACG. However, according to Articles 6.2 and 6.3 of the GTA, ACG is obligated to provide a transportation stand that IHI is contractually required to use to pack each engine that is to be returned. Yet until very recently ACG had refused to provide the transportation stand necessary for the return of the V10154 engine.

11

62.    Only on March 4, 2009, after ACG filed its Complaint on February 6, 2009, did ACG finally provide the required transportation stand to IHI through its forwarder.  However, the transportation stand ACG provided was unusable because of a problem with the stand's connecting parts.  IHI notified ACG's forwarder of this problem, but the problem has yet to be rectified.

63.    ACG has also refused to pay the storage fees owed for storing the V10154 engine pursuant to ACG's own request to IHI to hold the engine after July 18, 2008.  Reasonable storage fees based on competitive market rates are, by ACG's own admission not less than US$ 250 per day.  Thus the total amount of storage fees owed by ACG is at least US$ 61,250.  Furthermore, ACG has not paid the packing fees for storing the V10154 engine.

64.    On information and belief, in November of 2008, ACG's MSN0580 airplane and ILFC's MSN0496 airplane were flown to Düsseldorf, Germany, where the V10080 engine was removed from ACG's airplane and placed back onto ILFC's airplane.  The V12580 replacement engine was returned to IAE on December 24, 2008.

### Counterclaim Count I: Breach of Contract
### (Failure to Induct)

65.    Counterclaim-Plaintiff incorporates Paragraphs 29-64 above as if fully set forth herein.

66.    IHI and ACG lawfully entered into the June 16, 2005 Settlement Agreement whose copy is annexed to the Complaint as Exhibit A.

67.    Under Clauses 2 and 3 of the Settlement Agreement, ACG was obligated to provide IHI with revenue in the form of both engine overhaul fees and leasing fees, in return for

tk-325058

a discount on the invoice for the repair and overhaul of the V10035 engine that derived from the GTA.

68.    ACG breached Clause 2 of the Settlement Agreement by failing to deliver and induct, within three years of entering into the agreement, a third engine to IHI for overhaul as required by the agreement.  Pursuant to the agreement's liquidated damages provision, ACG owes IHI US$ 150,000, plus interest, for its breach.

## Counterclaim Count II: Breach of Contract
## (Failure to Lease)

69.    Counterclaim-Plaintiff incorporates Paragraphs 29-68 above as if fully set forth herein.

70.    ACG breached Clause 3 of the Settlement Agreement by failing to lease engines from IHI in connection with the induction of the V10155 and V10154 engines as required by the agreement, even though leased engines were available to IHI and IHI was ready and willing to lease engines to ACG.

71.    IHI, in order to mitigate any further damages caused by ACG's breach, leased the V12580 engine from IAE and subleased it to LTE to replace the V10154 engine.

72.    ACG's breach has resulted in damages of at least US$ 992,285 to IHI, as reflected in the sublease rentals for the replacement engine for the V10154 engine, and further sums for a replacement of the V10155 engine, and interest thereon.

73.    ACG has not remedied or compensated IHI for any of the damages caused by this breach.

tk-325058

**Counterclaim Count III: Breach of Implied Covenant of Good Faith and Fair Dealing**

74.    Counterclaim-Plaintiff incorporates Paragraphs 29-73 above as if fully set forth herein.

75.    The Settlement Agreement includes an implied covenant of good faith and fair dealing that precludes each party from engaging in conduct that will deprive the other party of the benefits of the agreement.

76.    ACG had a duty under the Settlement Agreement to act in good faith and engage in fair dealing.

77.    ACG violated its duty and covenant to act in good faith and engage in fair dealing by deliberately failing to lease engines from IHI in connection with the induction of ACG's engines to IHI for repair and overhaul, as expressly required by the Settlement Agreement.

78.    On information and belief, ACG further violated its duty and covenant to act in good faith and engage in fair dealing by asking IHI in June of 2008 and thereafter to withhold the repaired V10154 engine from LTE in order to pressure LTE into prioritizing its accounts payable to ACG over those of other entities such as IHI.

79.    On information and belief, ACG was well aware that LTE was in financial trouble and was likely to default on its lease and other payments to ACG in connection with ACG's MSN0580 airplane.  On information and belief, ACG was well aware of IHI's sublease of a replacement engine for the V10154 engine to LTE and that this enabled LTE to fly ACG's MSN0580 airplane.  Moreover, on information and belief, ACG was well aware that asking IHI to withhold the repaired V10154 engine from LTE would extend the actual term of the sublease for the V12580 engine at a time ACG had strong concerns about LTE's ability to pay leasing fees.

tk-325058

80.    ACG's violation of its covenant of good faith and fair dealing has resulted in damages of at least US$ 992,285 to IHI, as reflected in the sublease rentals for the replacement engine for the V10154 engine, and further sums for a replacement of the V10155 engine, and interest thereon.

### Counterclaim Count IV: Unjust Enrichment

81.    Counterclaim-Plaintiff incorporates Paragraphs 29-80 above as if fully set forth herein.

82.    According to Paragraph 10 of the Complaint, ACG alleges that it was not a party to the sublease of the V12580 replacement engine to LTE for ACG's V10154 engine.

83.    Nonetheless, ACG has been enriched by virtue of the sublease, since it enabled LTE to operate and fly ACG's MSN0580 airplane and thereby generate revenue to pay ACG's leasing fees, when otherwise LTE could not, and ACG did not pay any leasing fees to IHI. ACG has also been enriched by asking IHI in June 2008 and thereafter to withhold the repaired V10154 engine from LTE in order to pressure LTE into prioritizing its accounts payable to ACG over those of other entities such as IHI. On information and belief, ACG was thereby able to collect outstanding payments from LTE and managed to terminate its airplane lease before LTE became insolvent.

84.    ACG has also been enriched by IHI's storage of the V10154 engine. ACG has refused to pay the storage and packing fees for the V10154 engine even though IHI complied with ACG's request to hold on to the engine after July 15, 2008.

85.    ACG's enrichment has been at the expense of IHI. IHI leased the V12580 replacement engine from IAE and subleased it to LTE to mitigate damages caused by ACG's breach of the Settlement Agreement, only to see LTE fail to pay IHI at least US$ 992,285 in fees

15

for the sublease. IHI also made the necessary arrangements and incurred costs for storing and packing the V10154 engine.

86.     It would be unjust to allow ACG to retain the benefits described above. On information and belief, ACG was well aware of IHI's sublease of the V12580 replacement engine for ACG's V10154 engine to LTE, and that this enabled LTE to fly ACG's MSN0580 airplane. On information and belief, ACG was also well aware that LTE was in financial trouble and was likely to default on its lease and other payments to ACG in connection with ACG's MSN0580 airplane. Moreover, on information and belief, ACG was well aware that asking IHI to withhold the repaired V10154 engine from LTE would extend the actual term of the sublease for the V12580 replacement engine at a time ACG had strong concerns about LTE's ability to pay leasing fees. On information and belief, ACG was also well aware that IHI had to store the V10154 engine pursuant to ACG's request.

87.     The circumstances were such that equity and good conscience require ACG to make restitution.

                    *                    *                    *

        Defendant and Counterclaim-Plaintiff IHI hereby reserves the right to amend the foregoing defenses and responses based on facts and circumstances that may hereafter arise or come to light in this action.

        WHEREFORE, defendant and counterclaim-plaintiff IHI prays that this Court enter judgment:

        (a)     rejecting Plaintiff's claim for a declaration that it has no liability to Defendant for the US$ 992,285 or any other sum requested by Defendant;

16

tk-325058

(b)      declaring that Plaintiff has breached the Settlement Agreement and awarding Defendant: (1) damages arising in connection with the breach in an amount in excess of US$ 992,285 and interest thereon; (2) liquidated damages in the amount of US$ 150,000 and interest thereon; and (3) storage fees in the amount of at least US$ 250 per day since July 18, 2008 and other fees associated with the storage of the V10154 engine, and interest thereon.

(c)      declaring that Plaintiff has breached its implied covenant of good faith and fair dealing and awarding Defendant damages arising in connection with the breach in an amount in excess of US$ 992,285 and interest thereon;

(d)      declaring that Plaintiff has been unjustly enriched and granting Defendant restitution for the unpaid leasing fees, the unpaid storage fees and other fees associated with the storage of the V10154 engine, and the interest thereon;

(e)      awarding Defendant its costs, disbursements, and attorneys' fees incurred in this action; and

(f)      granting Defendant such other and further relief as the Court may deem just and proper.

17

Dated: New York, New York
       May 29, 2009

By:                                     
        James E. Hough (JH-1066)
        MORRISON & FOERSTER LLP
        1290 Avenue of the Americas
        New York, New York 10104-0050
        (212) 468-8000

        Robert H. Kreutzer (RK-1532)
        7955 E. Chaparral Rd. Unit 110
        Scottsdale, AZ 85250-7233
        (480) 367-9073

        Craig I. Celniker (CC-2352)
        Shogo Asaji (SA-8547)
        MORRISON & FOERSTER LLP
        Shin-Maru Building 29th Fl.
        1-5-1 Marunouchi, Chiyoda-ku
        Tokyo, Japan 100-6529
        (011-81-3) 3214-6522

        Attorneys for Defendant
        IHI Corporation

tk-325058

# EXHIBIT  1

# GENERAL TERMS OF AGREEMENT

between

## AVIATION CAPITAL GROUP CORP.

and

## ISHIKAWAJIMA-HARIMA HEAVY INDUSTRIES CO., LTD.

No. ACG/IHI/V2500/01

1

# INDEX

ARTICLE 1. DEFINITIONS .................................................................................3

ARTICLE 2. APPLICATION .................................................................................5

ARTICLE 3. WORK .................................................................................6

ARTICLE 4. MATERIALS AND PARTS .................................................................................6

ARTICLE 5. INSPECTION .................................................................................6

ARTICLE 6. TRANSPORTATION AND CUSTOMS CLEARANCE .................................................7

ARTICLE 7. PRICE AND PAYMENT .................................................................................8

ARTICLE 8. TAXES .................................................................................11

ARTICLE 9. WARRANTY .................................................................................11

ARTICLE 10. EXCUSABLE DELAYS .................................................................................12

ARTICLE 11. LIQUIDATED DAMAGES .................................................................................13

ARTICLE 12. DELIVERY OF EQUIPMENT .................................................................................13

ARTICLE 13. LIMITATION OF LIABILITY .................................................................................14

ARTICLE 14. LAW AND ARBITRATION .................................................................................14

ARTICLE 15. PERIOD OF AGREEMENT .................................................................................14

ARTICLE 16. TERMINATION .................................................................................14

ARTICLE 17. ASSIGNMENT .................................................................................15

ARTICLE 18. NOTICE .................................................................................15

ARTICLE 19. TITLE AND RISKS .................................................................................16

ARTICLE 20. LANGUAGE AND HEADERS .................................................................................16

ATTACHMENT 1.   MAJOR WORK SCOPE FOR V2500 .................................................................................18

ATTACHMENT 2.   FIXED ROUTINE LABOR PRICE FOR V2500 .................................................................................19

ATTACHMENT 3.   BASIC WORK SCOPE FOR CFM56-3 .................................................................................21

ATTACHMENT 4.   FIXED ROUTINE LABOR PRICE FOR CFM56-3 .................................................................................22

IHI Proprietary                                                                 2

THIS AGREEMENT MADE THIS ___ DAY OF _____ 2004, BY AND BETWEEN AVIATION CAPITAL GROUP CORP. (HEREAFTER CALLED "BUYER"), A CORPORATION ORGANIZED AND EXISTING UNDER THE LAW OF STATE OF DELAWARE AND HAVING ITS REGISTERED OFFICE AT 800 NEWPORT CENTER DRIVE SUITE 425 NEWPORT BEACH, CALIFORNIA 92660, USA, AND ISHIKAWAJIMA-HARIMA HEAVY INDUSTRIES CO., LTD. (HEREAFTER CALLED "IHI"), A CORPORATION ORGANIZED AND EXISTING UNDER THE LAW OF JAPAN AND HAVING ITS REGISTERED OFFICE IN SHIN OHTEMACHI BLDG., 2-1, OHTEMACHI 2-CHOME, CHIYODA-KU, TOKYO 100-8182, JAPAN.

WITNESSETH:

WHEREAS, Buyer is in possession of certain V2500 model and CFM56-3 model aircraft gas turbine engine; and

WHEREAS, Buyer desire to have certain work (repair/overhaul) carried out on the engines, their modules, parts and/or accessories; and

WHEREAS, IHI is an approved FAA Repair Station No GA4Y199M and JAA Repair Station No CAA.00679 for the repair and /or overhaul aircraft gas turbine engines and IHI is willing to carry out the work to be ordered by Buyer from time to time subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, it is agreed between the parties as follows:

## ARTICLE 1. DEFINITIONS

In this Agreement the following terms shall have the meanings defined herein:

1. Engines
   "Engines" means the IAE V2500 engine manufactured by International Aero Engines AG (hereinafter called "IAE") or CFM56-3 engine manufactured by CFM International, Inc. (hereinafter called "CFMI"), excluding those QEC, thrust reverser and aircraft accessories.

2. Modules
   "Modules" means any modules of the Engines as such term is defined in the Manual which, when assembled, constitute a complete Engine.

3. Parts
   "Parts" means any part or parts of Engines listed in the engine manufacturer's illustrated parts catalog (other than complete Engine).

4. Accessories
   "Accessories" means accessories and component mounted on the Engines.

IHI Proprietary                                                    3

5. Supplies

"Supplies" means Engines, Modules, Parts, Accessories, other items of associated equipment and Records relating to such Engines, Modules or Parts to be delivered by Buyer to IHI for Work.

6. Manufacturers

"Manufacturers" means the respective manufacturers of Engines, Modules, Parts and Accessories.

7. FAA

"FAA" means the United States Federal Aviation Administration or its successor

"JAA" means the Joint Aviation Authorities or its successor

8. Manual

"Manual" means, in respect of any Supplies, Buyer's FAA approved OEM Engine Shop Manual and any amendments or revisions thereto or, where Parts are not manufactured by OEM, any other relevant Manufacture's Maintenance Manual.

9. Serviceable

"Serviceable" means, in respect of any Supplies, that those Supplies are in a Serviceable, airworthy condition as required by the FAA in accordance with the Manual.

10. Records

"Records" means

(a) all written evidence as to the Serviceable condition of Engines, Modules or Parts including serviceability tags, maintenance records and all such information, documents or records in relation to Engines, Modules or Parts which are required to be kept in compliance with any requirement of the FAA, and

(b) any other Records, logs, Manuals, computer data and other materials and documents in the possession of or from time to time compiled by Buyer or IHI in relation to any Engines, Modules or Parts.

11. Work

"Work" means Overhaul, Modification, Parts Repair, Rectification, Refurbishment, as defined herein, assessment, inspection and any related work ordered by Buyer in accordance with Article 3 to be performed by IHI on in connection with any Supplies in accordance with this Agreement.

12. The Work carried out by IHI is categorized as follows:

1) Overhaul

"Overhaul" means reconditioning or the Work necessary to return any Engines, Modules, or Accessories to a Serviceable condition in accordance with Manufacturers' manual.

2) Modification

"Modification" means the accomplishment of the Work in accordance with Manufacturers' service bulletin or Buyer's specifications for the modification.

3) Parts Repair

"Parts Repair" means the accomplishment of the Work that is necessary to restore repairable Parts to a Serviceable condition.

4) Refurbishment

"Rectification/Refurbishment" means the Work to disassemble the Supplies as necessary, clean, inspect, repair and replace the Parts of the disassembled portions to rectify reported defects, including defects found in the course of the Work, and to carry out requested Work as necessary. It includes interface inspection, checking the functions of major Accessories, re-assembly and testing of the Supplies.

13. Work Scope

"Work Scope" means any Work Scope issued in accordance with Article 3 of this Agreement.

14. Major Work Scope

"Major Work Scope" means Work Scopes as set forth in Attachment 1.

15. Abbreviations

AD:    Airworthiness Directive
CLP:   Catalog List Price
COP:   Customer Owned Parts
DER:   Designated Engineering Representative
EGT:   Exhaust Gas Temperature
FAA:   Federal Aviation Administration of United Statues of America
LLP:   Life Limited Parts
OEM:   Original Equipment Manufacturer
PMA:   Parts Manufacturer Approved
QEC:   Quick Engine Change
SB:     Service Bulletin
TAT:   Turn Around Time


**ARTICLE 2. APPLICATION**

This Agreement constitutes the entire and only agreement between the parties with respect to the subject matter hereof and supersedes, cancels and annuls all prior or contemporaneous negotiations or communications.

The terms and conditions of this Agreement shall apply to any Work Scope issued by Buyer and accepted by IHI pursuant to this Agreement to the exclusion of any other terms and conditions not contained or referred to in this Agreement.

This Agreement shall be non-exclusive between Buyer and IHI, and Buyer is in no way obligated to avail itself of the services of IHI pursuant to this Agreement.

Amendment to this Agreement shall be made only by the consent and agreement of the both parties in

writing.

## ARTICLE 3. WORK

1.  Prior to the shipment of the Supplies, Buyer shall issue to IHI a Work Scope stating the category of the Work and any special instructions.   At the time of issuance of the Work Scope, Buyer shall provide IHI with such Records of the Supplies as may be reasonably required for the performance of the Work.

2.  Buyer shall exercise its best reasonable efforts to provide IHI with an accurate forecast of the Work to be ordered so that IHI can plan the Work under this Agreement in the most effective manner.

3.  IHI shall carry out the Work in accordance with the terms of this Agreement and of any Work Scope issued by Buyer as well as any specific work scopes from time to time agreed in relation to the Supplies and shall observe the T.A.T. (time period from the date of arrival of the Supplies at IHI's plant until its departure from IHI's plant) as specified below:

> 60 calendar days for major repairs, including overhauls. (Guaranteed Maximum TAT)

4.  New Work not categorized in item 12 of Article 1 hereof may be ordered by a Work Scope with detail specifications, subject to IHI's acceptance.

## ARTICLE 4. MATERIALS AND PARTS

1.  IHI shall supply all necessary materials and Parts for the performance of the Work unless Buyer informs IHI that it wishes to furnish such Parts and materials to IHI.

2.  IHI shall store all Supplies held by it pursuant to this Agreement in a safe and secure designated location at IHI's facility.  Supplies shall be adequately identified as the property of Buyer by means of placards affixed to the wall in the designated area and where relevant to any Engine, which shall state "These Parts/this Engine are/is the property of Aviation Capital Group Corp.".   Storage of all Supplies is to be conducted in accordance with the provisions of the relevant Manual.

## ARTICLE 5. INSPECTION

1.  The Supplies shall be inspected and checked by IHI's qualified inspectors during the execution and at the time of completion of the Work, and a certificate of conformance will be submitted by IHI to Buyer for each item of the Supplies in accordance with the requirements of FAA and JAA including the furnishing of an airworthiness tag.

2.  In the event that inspected Parts are determined by IHI not to be within repairable limits or economical repair limit, IHI shall notify Buyer of this in writing and at Buyer's option IHI shall either
   (i)      return such Parts to Buyer or

· (ii)    scrap such Parts at IHI's plant two (2) months after the delivery of the Supplies.

Upon request of Buyer, IHI shall send Parts to be scrapped to Buyer together with the return shipment of the Supplies.   The additional cost of packing and shipment of such Parts, if any, shall be borne by Buyer.

3.   The economical repair limit shall be within seventy five (75.0%) percent of the Manufacturer' current list price (CLP).

4.   IHI shall provide Buyer with photographs of incoming condition of Engine and all damages found on Engine disassembly together with the shop visit report.

5.   IHI shall furnish Buyer with a detailed shop visit report upon completion of each dirty inspection and shall provide written reports and request for Buyer's decision following inspection of the Supplies as to the findings or reasons of failure of any Supplies or as to the status of all Work currently being undertaken on behalf of the Buyer.

### ARTICLE 6. TRANSPORTATION AND CUSTOMS CLEARANCE

1.   Cost of transportation of Supplies from Buyer to major international airport in USA, and from such Airport to Buyer shall be Buyer's expense and responsibility

2.   Buyer shall pack the Supplies in Buyer's transportation stand or Buyer's container in accordance with the then current recommendation of the Manufacturers.  Buyer shall ship the Supplies to such airport prepaid.  Simultaneously with such shipment, Buyer shall send to IHI the shipping documents, including airway bill, custom invoice and other documents necessary for customs clearance in Japan.

3.   IHI shall attend to all matters required to effect importation of the Supplies from such airport defined in section 1 of this Article, such as customs clearance at Narita Airport, inland transportation from such airport defined in section 1 of this Article to IHI's plant, and exportation of the repaired/overhauled Supplies by FCA (major international airport in USA) in accordance with INCOTERMS 1990.  IHI shall pack the Supplies in the transportation stand or in Buyer's container in accordance with the then current recommendations of the Manufacturers and ship them freight collect.  Simultaneously with such shipment, IHI shall send to Buyer's shipping agent with one copy to Buyer, the shipping documents, including airway bill, customs invoice and other documents necessary for customs clearance in the Buyer's country.

4.   The fares and expense or charges related to handling, packing, inland transportation, customs clearance in the country other than Japan shall be Buyer's expense and responsibility. The fares and expenses or charges related to handling, inland transportation, and customs clearance in Japan shall be IHI's expense and responsibility.

5.   Buyer shall arrange for and bear the cost of insurance against loss of and/or damage to the Supplies during their transportation between Buyer and Narita Airport.

6.  Both parties shall pack and mark Supplies at its packaging in accordance with good industries practices, the manufacturer's recommendations and any instructions furnished by Buyer to IHI in writing from time to time.

### ARTICLE 7. PRICE AND PAYMENT

1.  Labor Charge

1.1 Labor Rate

The labor charge for Routine Labor Work shall be based on the Fixed Routine Labor Prices specified in Attachment 2 for V2500 and Attachment 4 for CFM56-3 of this Agreement.   Any specific exclusion from the Fixed Routine Labor Prices and all Non-Routine Labor hours will be charged at the labor rate specified in Section 1.2 of this Article 7.

1.2 Labor Rate

The labor charge for work not subject to the Fixed Routine Labor Prices shall be fifty six US Dollars ($56.00) per man-hour for additional work on an actual time basis.

In house repair may be applied to fixed repair price based on Buyer's acceptance.

1.3 Escalation formula for labor rate and Fixed Routine Labor Prices

$$L = Lo \times F/Fo$$

WHERE:
- $L$ = Labor Rate for this calendar year
- $Lo$ = Labor rate for the last calendar year
- $Fo$ = The average of the Wage Indices of Regular Employees in Transportation Equipment of Manufacturing Industries of Japan for the penultimate calendar year.
- $F$ = The corresponding average for the last calendar year.

- i) An escalation rate will be applied on an annual basis starting 1st Jun 2006.
- ii) The annual escalation rate shall be capped to a maximum of three (3%) percent.
- iii) The Fixed Routine Labor Prices and/or the labor rate applicable to Work shall be that in effect at the time of arrival of the Supplies at IHI's facility.
- iv) The escalation formula herein shall be applied to i) the Fixed Routine Labor Prices set forth in this Agreement and ii) the Labor rate set forth in Section 1.2 of this Article 7.

2.  Parts Charge

2.1  New material
When new Parts required for the Work are issued from IHI's stock and the removed Parts are not returned to IHI's stock, IHI shall charge Buyer the Manufacturer's current list price (CLP) valid at the

IHI Proprietary                                                                                         8

time of the Supplies' arrival at IHI's plant plus ten percent (10%) of the CLP of the Parts. However, the total amount per each item to be paid as a percentage shall not exceed US Dollar 4,500.00 per line item and US Dollar 3,500.00 per part.

The removed Parts will be returned to Buyer, unless such Parts are deemed by IHI to be beyond technical or economical repair and the such Parts will be either returned to buyer or scrapped at IHI. IHI to supply evidence of destruction of all scrapped material to Aviation Capital Group Corp. within 10 days after destruction.

2.2  Serviceable material

In the event IHI uses repaired and serviceable Parts (excluding life limited Parts) from IHI's repaired Parts stock and the removed Parts are not returned to IHI's stock, the repaired Parts charge applicable to them shall be seventy-five percent (75%) of CLP, with nine percent (9%) handling fee. However the repaired and serviceable Parts handling fee per each line item to be paid as a percentage shall not exceed US Dollar 5,000.00 per line item and US Dollar 4,000.00 per part.

2.3  Life Limited Parts

In the event IHI uses LLP, IHI will charge Buyer the cost of the LLP as determined by the following formula:

X multiplied by A
WHERE:
X is the per cycle cost of the respective LLP (CLP divided by the OEM specified life cycle)
A is the life remaining on the installed (IHI) LLP

and a handling fee of eight percent (8%) of the prorated cost of the LLP. The LLP handling fee shall not exceed US Dollar 4,000.00 per LLP.

2.4  Material provided by Buyer

When Buyer supplies Parts as provided in Article 4 hereof, IHI shall charge Buyer a handling fee of two and half percent (2.5%) of the CLP as the material handling fee. In such case, Buyer shall send, at its own expense, the Parts to IHI for storage on Buyer's account and the removed Parts shall be either scrapped or repaired and returned to Buyer's stock.

2.5  Consumable material

Consumable material shall be charged at actual cost.

3.  Engine test cell fee

The fee for one engine test per each Work Scope to be carried out by IHI following repair of the Engine ("Standard Test") shall be US Dollar 13,000.00 for V2500 engine model and US Dollar 11,000.00 for CFM56-3 engine model. This fee shall not include preparatory work, labor hours for test, but shall include fuel and oil, regardless of the number of runs to make good the Engine in accordance with performance requirement of the Manufacturer's manual.

The preparatory work and labor hours for test shall be a part of the routine fixed price in Section 1.1 of

this Article 7.   If Buyer request a receiving test or any special engine test, or if the Engine is rejected for a cause beyond the reasonable control of IHI, additional fee for engine test cell usage shall be charged the same amount above for the Engine per each engine test.

4.   Exchange fee

In case Parts required for the Work are issued from IHI's repaired Parts stock to replace removed Parts which will be repaired and returned to IHI's stock, the total charge for repair of the Parts removed from the Engine and the parts exchange fee for Parts other than life limited Parts ( "LLP" ) of seven percent (7.0%) of the CLP of the Parts shall be charged to Buyer, but the parts exchange fee to be paid as a percentage shall not exceed US Dollar 4,500.00 per each line item and US Dollar 3,500.00 per part.

When IHI install new material as exchange part based on the customer request, Twenty five percent (25%) of the value difference between repaired material and new material shall be charged to Buyer in addition to the parts exchange fee.

5.   Subcontract handling fee

In case of outside vendor repair, the Vendor direct invoice cost including transportation cost, customs clearance and insurance plus eight and half percent (8.5%) of Vendor direct invoiced cost shall be charged to Buyer, but the subcontract handling fee to be paid as a percentage shall not exceed US Dollar 5,000.00 per each line item.

6.   High Speed Grinder Usage Fee

When de-blade and assembly of High Pressure Compressor Rotor is performed, and High Speed Grinder is used. US $8,000.00 per shop visit shall be charged as usage fee.

7.   Payment

7.1 IHI shall present the following documents to Buyer.

1) One commercial invoice
   - Listing and cost of all Material replaced by module
   - Listing and cost of all Material repaired by module
   - Listing and cost of all Material exchanged by module
   - Listing of all labor and cost by module
2) One copy of the Engine Maintenance Report
   - Type of Maintenance performed on the Engine
   - Type of Maintenance performed on each module
   - One copy of quality certification for the repair/ overhaul
   - Final Workscope
   - Pre shop visit LLP sheet including traceability of all replaced LLP's back to birth
   - Test Cell Performance Data
   - Airworthiness Directives, Service Bulletins Incorporated list

IHI Proprietary                                                                                    10

- Status list of warranty claims concessions, credits, etc., for work accomplished during shop visit
- Shop findings report
- On & Off Log of parts list

3) One copy of the packing list.

4) One copy of air waybill.

7.2 Buyer shall make the payment against IHI's invoice in full in US dollars by wire transfer remittance within forty five (45) days after the receipt of IHI's invoice to the bank account specified below:

Resona Bank Limited, Otemachi Banking Department

1-1, Ohtemachi 2-chome, Chiyoda-ku, Tokyo, Japan

A/C No.        137283

A/C Name       IHI

SWIFT Code     DIWAJPJT

IHI shall send the final invoice within 3 months after the Engine delivery.   If IHI cannot send the final invoice within 3 months after the Engine delivery, IHI shall send the notice to Buyer with the reasonable explanation.

If the above payment to IHI is delayed, Buyer shall pay to IHI in addition to the invoice amount, interest at the rate of six and one half (6 ½) percent per annum for the delay.

## ARTICLE 8. TAXES

All customs duties, taxes, if levied, assessed, or imposed by the Government of the Buyer's country or any country other than Japan or any political subdivision, department or agency thereof, shall be paid by Buyer, and if levied, assessed, or imposed by the Government of Japan or any political subdivision, department of agency thereof, shall be paid by IHI.

## ARTICLE 9. WARRANTY

1.   IHI warrants to Buyer that all Services provided by IHI will be performed in compliance with Buyer requirements as specified in the Work Scope and in this Agreement, the applicable published specifications of the Manufacture in effect at the time the Work is performed and with applicable published directives and regulations of the FAA and JAA or any other applicable airworthiness or other regulatory agency requirements in effect at the time the Work is performed and will otherwise conform to standards of good workmanship.

The warranty period of the repaired Engine shall be eighteen (18) months from the date of delivery to Buyer, twelve (12) months from the date of first installation to the aircraft, the first two thousand and five hundred (2,500) hours of engine operation and/or the first two thousand and five hundred (2,500) cycles of engine operation, whichever expire earlier.

IHI will remedy defects including resultant damage in the Supplies in workmanship by, at Buyer's option, either ( i ) rectifying the defective Supplies free of charge to Buyer at IHI's plant, or ( ii ) making available at IHI's plant a repaired or replacement item of the Supplies, or ( iii ) returning the price allocated to the defective Work provided that Buyer shall notify IHI of the defects in writing within thirty (30) days after the Buyer's discovery of the defects.   Buyer may, with IHI's agreement, rectify the defective Supplies at IHI's expense at Buyer's facility or another repair company.

At IHI's request, and if reasonably practical to do so, Buyer shall ship the defective Supplies to the IHI's plant with the freight prepaid. In case of a defect in workmanship, IHI shall bear the transportation cost of the Supplies to and from IHI and reimburse the costs Buyer has already paid.   Otherwise Buyer shall bear the transportation costs of the Supplies to and from IHI.

IHI does not warrant Parts supplied by IHI under this Agreement, therefore only the warranty of Manufacturer shall apply to such Parts.   IHI shall extend to Buyer the benefit of all assignable warranties and indemnities in respect of or related to the Supplies that are available to IHI given by any Manufacturer of any Parts.

2.     THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESSED, IMPLIED OR STATUTORY (INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE).

IHI shall not be responsible for the said warranty under this Article unless the Supplies have been stored, installed, operated, handled, maintained and repaired in accordance with the current recommendations by the Manufacturers as stated in the Manufacturer's manual, service bulletins or other instructions, and this Article gives no claim to consequential damages.

3.   The liability of IHI in connection with or resulting from the foregoing warranty shall not in any case exceed the price of the Work which gave rise to the claim, and upon the expiration of the shortest period described in item 1 of this Article, all such liability shall terminate.   The foregoing shall constitute the sole remedy of Buyer and the sole liability of IHI for breach of warranty, whether the claim is in contract, warranty, tort (except gross negligence and/or willful misconduct) or otherwise.

4.   IHI allows Buyer to transfer the engine warranty to the third party (its lessee and/or buyer of the Engine) as long as the operational parameters are in accordance with the requirements of the warranty as specified herein.   Buyer shall send the notice of transfer to IHI.   After the receipt of Buyer's notice, the respective Warranty obligation of IHI to Buyer shall be deemed assigned to and directly enforceable by such third company.


**ARTICLE 10. EXCUSABLE DELAYS**

1.   Neither Party shall be responsible nor deemed to be in default of this Agreement or any Work Scope, for delay in the delivery of the Engines, or for failure or delay in the performance of any other act to be performed by either Party under this Agreement if such, delay or failure is due to any of the following

IHI Proprietary                                                                                                  12

causes: war, insurrection or riot, fires, floods, severe weather, earthquake, epidemics, or other acts of God, quarantine restrictions, direct governmental interference, strike of government or the airlines normally used to transport Engines and labor troubles or due to any other cause where such cause is beyond either Party's reasonable control ("Force Majeure").

2. In the event of Force Majeure or in the case of Japan's year-end and New Year holidays, Guaranteed Maximum TAT shall be extended for the period such Force Majeure or holiday lasts

3. If such, delays and failure are reasonably anticipated, such Party shall promptly notify the other Party of the cause thereof and thereafter shall from time to time advise the other Party concerning the status thereof. This provision shall not, however, relieve the Party affected by Force Majeure from using its best efforts to mitigate the effect of such case with reasonable dispatch.

4. In the event that performance interruption by either Party of any obligation under this Agreement is due to Force Majeure which lasts a continuous period of fifteen (15) days, the Parties shall consult with each other with respect to the treatment of the Work Scope; in case no agreement is reached by both Parties within a subsequent fifteen (15) day period, any Party shall have right to cancel the Work Scope thenceforth by notice to the other Party. Buyer shall be obligated to pay for any Services being performed at the time of such cancellation.

## ARTICLE 11. LIQUIDATED DAMAGES

1. In case Buyer find it necessary to operate a leased Engine for short of spare Engines in due to IHI's failure to meet the T.A.T. specified in Article 3 of this Agreement and such failure is due to other causes than excusable delay as defined in Article 10 hereof, IHI will pay as liquidated damages the actual daily lease charge up to $2,500 per day for the period from the first day of operation of the leased Engine until the actual date of delivery of the Engines by IHI or the actual date of arrival of a spare Engine in Buyer's country of operation, whichever comes earlier.

2. Providing however the maximum amount of liquidated damage for which IHI shall be liable shall not exceed one hundred fifty thousand US dollars (US$150,000) for each engine Work Scope.

3. If IHI is hindered or prevented from performing its obligations with IHI's promised TAT due to Force Majeure as defined in Article 10 hereof, IHI shall be free from any payment of liquidated damages. Any liquidated damages payable by IHI under this Article shall not be deducted from the invoice amount nor shall be set off by any money due to IHI under this Agreement and such liquidated damages shall be paid directly by IHI within forty (40) days after receipt of Buyer's invoice to be issued when the total amount of such liquidated damages has been fixed.

## ARTICLE 12. DELIVERY OF EQUIPMENT

All Supplies shall be delivered to IHI and returned to Buyer by shipment between Buyer's maintenance base (or such other location as Buyer may advise from time to time) and IHI's plant Tokyo, Japan. IHI's plant address is:

IHI Mizuho    Maintenance Department
229 Tonogaya, Mizuho-machi, Nishitama-gun
Tokyo 190-1297
Japan

## ARTICLE 13.   LIABILITY AND INDEMNIFICATION

Each Party will indemnify and hold harmless the other Party, its directors, officers, employees, agents and subcontractors from against all claims of third parties (including, without limitation, all costs, expenses and fees, including reasonable attorney's fees, incident thereto) related to the damages, loss, injury or death caused by the negligence or the willful misconduct of the indemnifying Party, its directors, officers, employees, agents or subcontractors.

In no event, whether as a result of breach of contract, alleged negligence, or otherwise, shall either Party be liable for special, incidental or consequential damage such as, but not limited to, loss of profits or revenue, loss of use of Supplies, cost of capital, or similar items.

## ARTICLE 14. LAW AND ARBITRATION

This Agreement is governed by, interpreted and construed in accordance with the laws of New York.   It is mutually agreed that in the performance of this Agreement, both parties shall exercise their best efforts with mutual trust for successful execution.   Should any dispute arise which can not be settled amicably by the parties to this Agreement, such dispute shall be submitted to arbitration in New York in accordance with the rules of the American Arbitration Association.

In such case, each party shall appoint an arbitrator who shall not be connected financially or otherwise with either of the parties or their employees or their shareholders.   A third arbitrator who shall act as chairman shall be appointed by the both parties by mutual agreement within thirty (30) days after nomination of the second arbitrator.   The award of the arbitration shall be final and binding upon both parties, and judgment on the award rendered may be entered in any court having competent jurisdiction.

## ARTICLE 15. PERIOD OF AGREEMENT

The Agreement shall come into force on the date and year first above written and shall continue in force for a period of three (3) years therefrom.   The period of this Agreement shall be automatically extended for a period of one (1) year unless either party shall send to the other party a written notice not to extend the period of this Agreement or a written proposal to amend this Agreement at least three (3) month prior to the expiry of the original or an extended period of duration.

## ARTICLE 16. TERMINATION

IHI or Buyer (as appropriate) shall have the right wholly or partially to suspend the services and terminate

IHI Proprietary                                                                                           14

the Work Scope or this Agreement with immediate effect by written notice to the other in the following circumstances ("Events of Default"):

(a) in the event that Buyer or IHI shall become in default as to any of the terms and conditions of this Agreement and shall fail to correct such default within thirty (30) days after receipt of written notice from the other specifying the alleged default, and that such default exists, then the party giving such notice shall have the right to terminate this Agreement immediately by giving to the other party written notice to such termination;

(b) if either party initiates an action or any legal proceedings or if any other steps are taken for ( i ) that party or any of its subsidiaries to be adjudicated or found bankrupt or insolvent; ( ii ) winding up or dissolution of it or any of its subsidiaries; ( iii ) the appointment of a liquidator, trustee, receiver, administrator, examiner or similar officer of or to any party or any of its subsidiaries or the whole or any part of its respective undertaking, assets, right or revenues; or (iv) the judicial protection of either party or any of its subsidiaries from creditors; and

(c) if IHI is unable to meet or perform its obligations under this Agreement by reason of an Excusable Delay for more than a period of twenty (20) days from the commencement of the event constituting such an Excusable delay.

Notwithstanding anything contained in this Agreement to the contrary, Buyer shall have the right to terminate this Agreement for any reason, without penalty, upon the provision of thirty (30) days written notice to IHI. However, Buyer shall be obligated to pay for any Services being performed at the time of such termination and IHI shall be obligated to complete such Services being performed at the time of such termination.

## ARTICLE 17. ASSIGNMENT

Neither party to the Agreement shall be entitled to assign the Agreement or any right or obligation under this Agreement to a third party other than Buyers' right to transfer the engine warranty pursuant to item 4 of Article 9, without a prior written consent of the other party, such consent not to be unreasonably withheld.

## ARTICLE 18. NOTICE

Whenever any notice is required to be given by either party to the other party, such notice shall be by telex/telefax or in writing and shall be addressed as follows:

TO BUYER:

Aviation Capital Group Corp.
800 Newport Center Drive

Suite 425
Newport Beach, California 92660
U.S.A.

Attn; Managing Director

Phone:   +1-949-219-4600
Fax:     +1-949-759-5675

TO IHI:

Ishikawajima-Harima Heavy Industries Co., Ltd.
229 Tonogaya, Mizuho-machi, Nishitama-gun
Tokyo 190-1297, Japan

Attn.: Manager, Sales Group, Maintenance Dept.

Phone:  +81-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
Fax:    +81-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

Such notice shall be effective from the date of receipt.

## ARTICLE 19. TITLE AND RISKS

1.   At all time title to all the Supplies located at IHI's plant shall remain with Buyer.

2.   However, if any item of the Supplies are lost, destroyed or damaged for want of care on the part of IHI during the time between arrival at Narita Airport and departure from Narita Airport (IHI shall use the same care in the custody of the Supplies as IHI uses in respect of IHI's own property) then IHI will at Buyer's option either:

   1) Repair such damage free of charge; or

   2) Provide a replacement part free of charge; or

   3) Pay to Buyer a sum not exceeding the Manufacturer's current list price for the Parts lost, destroyed or damaged, such sum to reflect the state of the Supplies prior to its loss, destruction or damage.

## ARTICLE 20. LANGUAGE AND HEADERS

All correspondence including but not limited to documents and technical data shall be in the English language. All headers used herein are for convenience of reference only and are not intended to be used to

IHI Proprietary                                                          16

interpret any portion of this Agreement.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed in their respective names by duly authorized representatives on the day and year first above written.

Signed for and on behalf of
   **Aviation Capital Group Corp.**

By:

Name:   Benjamin L. Jung

Title:   Managing Director

Signed for and on behalf of
   **Ishikawajima-Harima Heavy Industries Co., Ltd.**

By:

Name:   Toshinori Sekido

Title: General Manager, Maintenance Department

By:

Name:   Masato Misono

Title:    Manager, Sales Group, Maintenance Department

<u>Attachment 1.  Major Work Scope for V2500</u>

The tables below define what comprises the Major Work Scopes for V2500 engine model.

| <u>Module</u> | Hot Section Repair | HPC and Hot Section Repair | Engine Heavy Maintenance |
|---|---|---|---|
| LP compressor (Fan Rotor) | Level 1 | Level 2 | Level 3 |
| Fan case and fan frame | Level 1 | Level 1 | Level 2 |
| LP compressor (booster) | Level 1 | Level 1 | Level 2 |
| Internal gearbox / front bearing compartment | Level 1 | Level 1 | Level 2 |
| HP compressor | Level 1 | Level 2. | Level 3 |
| Diffuser / combustor | Level 2 | Level 2 | Level 3 |
| No. 4 bearing compartment | Level 2 | Level 2 | Level 3 |
| 1st nozzle guide vain group | Level 3 | Level 3 | Level 3 |
| HP turbine | Level 3 | Level 3 | Level 3 |
| LP turbine | Level 1 | Level 1 | Level 2 |
| External gear box | Level 1 | Level 1 | Level 2 |

(Note) Level 1 through 3 are defined in the Engine Manual.

- Major Work Scope include;
  - ➢ Detachment, and reattachment of Modules defined in the table in this Attachment
  - ➢ Module disassemble to piece parts and re-assemble them to the modules which are defined as Level 2 or Level 3 in the table in this Attachment
  - ➢ Module interface inspection to the Modules defined as Level 1 in the table in this Attachment
  - ➢ Detachment, visual inspection and reattachment of piece parts in the Modules defined as Level 2 or Level 3 in the table in this Attachment
  - ➢ Detachment, visual inspection and reattachment of accessories
- Major Work Scope exclude:
  - ➢ Non routine labor Work
  - ➢ Parts repair
  - ➢ Bench testing and Repair of accessories

IHI Proprietary

<u>**Attachment 2.   Fixed Routine Labor Price for V2500**</u>

1.   Fixed Routine Labor Price

The Fixed Routine Labor prices cover only routine labor hours specified hereinafter.   Any specific exclusions from the Fixed Routine Labor prices will be charged at the labor rate specified in Section 1.2 of Article 7 of this Agreement.

2.   Major Work Scope Maintenance

| Major Work Scope | Fixed Routine Labor Price |
|---|---|
| Hot Section Repair | $ 62,000.00 |
| HPC and Hot Section Repair | $ 127,400.00 |
| Engine Heavy Maintenance | $ 212,200.00 |

3.   Additional Module sectionalization

| Sectionalization | Task code | Fixed Routine Labor Price |
|---|---|---|
| LP compressor(Fan) Module | 72-00-31-020-001-002 | $2,300 |
| Fan Case / Intermediate Case | 72-32-00-030-000 | $9,660 |
| LPC/LPC Shaft | 72-32-00-030-010 | $2,650 |
| Intermediate Case/HPC | 72-00-41-020-001 | $7,300 |
| Diffuser Case | 72-00-42-020-002 | $8,050 |
| First NGV Group / Diffuser Case | 72-00-44-020-001-001 | $1,850 |
| HPT/First NGV Group | 72-00-45-020-001-001 | $2,900 |
| Turbine Exhaust Case / LPT | 72-00-50-020-003-000 | $2,950 |
| LPC/LPT Shaft | 72-00-50-020-002 | $3,100 |
| Gearboxes | 72-00-60-020-003-001 | $3,450 |

- Module sectionalization include;
  - ➤ Detachment and reattachment of modules defined in this section
  - ➤ Detachment, visual inspection and reattachment of accessories
- Module sectionalization exclude:
  - ➤ Bench testing of accessories

IHI Proprietary

4.  Additional modules repair

| Module | Module Maintenance Level 1 | Module Maintenance Level 2 | Module Maintenance Level 3 |
|---|---|---|---|
| Fan Module Maintenance | $980 | $13,750 | $14,950 |
| LP compressor (booster) maintenance | $840 | $9,490 | $17,250 |
| Internal gearbox / front bearing compartment maintenance | $890 | $6,650 | $9,500 |
| Fan case and fan frame maintenance | $920 | $5,650 | $8,650 |
| HP compressor Module Maintenance | $1,750 | $27,500 | $46,100 |
| Diffuser / combustor maintenance | $1,150 | $13,800 | $17,250 |
| No. 4 bearing compartment maintenance | $810 | $4,050 | $5,400 |
| 1st nozzle guide vain group maintenance | $800 | $3,560 | $5,940 |
| HP turbine maintenance | $1,150 | $16,000 | $17,850 |
| LP turbine Module Maintenance | $1,380 | $23,200 | $29,000 |
| External gear box maintenance | $810 | $7,100 | $13,550 |

-   Additional Module maintenance include;
    ➤   Detachment, visual inspection and reattachment of piece parts in Modules defined in this section
    ➤   Level 1 maintenance is module interface inspection only.
-   Additional Module maintenance exclude:
    ➤   Parts Repair

5.  Engine Level Work
    $18,000.00-
    -   Induction inspection
    -   Borescope inspection (at Induction and Post test cell)
    -   Preparation test cell
    -   Preparation to ship
    -   Compilation of documentation

IHI Proprietary

<u>Attachment 3.   Basic Work Scope for CFM56-3</u>

The table below defines what comprises the Basic Work Scope for CFM56-3:

Basic Work Scope includes the following work on Major modules and EMUs and Round trip of Engine transportation from US major airport.

1.   Module Sectionalization
- • Core Module                                      72-00-02
- • Low Pressure Turbine Module          72-00-03
- - Module sectionalization include;
  - ➢ Detachment, visual inspection and reattachment of module defined in this section
  - ➢ Detachment, visual inspection and reattachment of accessories
- - Module sectionalization exclude:
  - ➢ Bench testing of accessories

2.   EMU Sectionalization
- • HPC Rotor                                          72-00-31
- • HPC Front Stator                               72-00-32
- • HPC Rear Stator                                 72-00-33
- • Combustion Casing                            72-00-41
- • Combustion Chamber                        72-00-42
- • HPT Nozzle                                        72-00-51
- • HPT Rotor                                          72-00-52
- • HPT Shroud & LPT stg.1 Nozzle       72-00-53
- - EMU sectionalization include;
  - ➢ Detachment, visual inspection and reattachment of EMU defined in this section
  - ➢ Detachment, visual inspection and reattachment of accessories
- - EMU sectionalization exclude:
  - ➢ Bench testing of accessories

3.   EMU repair
- • HPC Rotor                                          72-31-00
- • HPC Front Stator                               72-32-00
- • HPC Rear Stator                                 72-33-00
- • Combustion Casing                            72-41-00
- • Combustion Chamber                        72-42-00
- • HPT Nozzle                                        72-51-00
- • HPT Rotor                                          72-52-00
- • HPT Shroud & LPT stg.1 Nozzle       72-53-00
- - EMU repair include;
  - ➢ Detachment, visual inspection and reattachment of piece parts in EMU defined in this section
- - EMU repair exclude:
  - ➢ Repair of piece parts

**Attachment 4.   Fixed Routine Labor Price for CFM56-3**

1.   Labor Charge

The Fixed Routine Labor prices cover only routine labor hours of the Work specified hereinafter.   Any specific exclusions from the Fixed Routine Labor prices will be charged at the labor rate specified in Section 1.2 of Article 7 of this Agreement.

2.   Basic Work Scope Maintenance

Basic Work Labor Price   $98,000-

3.   Additional Module and EMU setionalization

| EMU Sectionalization | Work Number | Fixed Routine Labor Price |
|---|---|---|
| Fan & Booster | 72-00-21 | $2,620 |
| No.1 & No.2 Bearing support | 72-00-22 | $840 |
| Inlet Gearbox & No.3 Bearing | 72-00-61 | $630 |
| HPT Shroud & LPT Stg.1 Nozzle | 72-00-53 | $210 |
| HPT Rotor | 72-00-52 | $840 |
| HPT Nozzle | 72-00-51 | $4,710 |
| Combustion Chamber | 72-00-42 | $530 |
| Combustion Case | 72-00-41 | $3,040 |
| HPC Front Stator | 72-00-32 | $4,190 |
| HPC Rear Stator | 72-00-33 | $4,190 |
| Turbine Rear Frame | 72-00-56 | $1,680 |
| LPT Shaft | 72-00-55 | $320 |
| Transfer Gear Box | 72-00-62 | $630 |
| Accessory Gear Box | 72-00-63 | $2,410 |

4.   EMU repair

| EMU repair | Work number | Fixed Routine Labor Price |
|---|---|---|
| Fan & Booster | 72-21-00 | $9,200 |
| No.1 & No.2 Bearing support | 72-22-00 | $5,400 |
| Inlet Gearbox & No.3 Bearing | 72-61-00 | $4,150 |
| Fan Frame | 72-23-00 | $9,000 |
| HPT Shroud & LPT Stg.1 Nozzle | 72-53-00 | $4,700 |
| HPT Rotor | 72-52-00 | $6,900 |
| HPT Nozzle | 72-51-00 | $2,650 |
| Combustion Chamber | 72-42-00 | $460 |
| Combustion Case | 72-41-00 | $5,200 |
| HPC Front Stator | 72-32-00 | $10,700 |
| HPC Rear Stator | 72-33-00 | $4,150 |

| | | |
|---|---|---|
| HPC Rotor | 72-31-00 | $14,900 |
| LPT Rotor & Stator | 72-54-00 | $15,400 |
| LPT Shaft | 72-55-00 | $5,900 |
| Turbine Rear Frame | 72-56-00 | $3,100 |
| Transfer Gear Box | 72-62-00 | $4,600 |
| Accessory Gear Box | 72-63-00 | $5,550 |

5.  Engine Level Work
     $16,000.00-
     -   Induction inspection
     -   Bore Scope inspection (at Induction and Post test cell)
     -   Preparation test cell
     -   Preparation to ship
     -   Compilation of documentation

IHI Proprietary

**EXHIBIT  2**



# AVIATION CAPITAL GROUP
A Pacific LifeCorp Company

## Purchase Order

| PURCHASE ORDER NO. | P.O. DATE | ON DOCK DATE |
|---|---|---|
| A00580-001 | December 13, 2007 | January 15, 2008 |

| REVISION # | REVISION DATE |
|---|---|
| (NONE) | |

**Bill To:**
Aviation Capital Group
610 Newport Center Drive
14th Floor
Newport Beach, CA 92660

| | |
|---|---|
| **P.O. TYPE:** Repair | **A/C Model/Type:** A320-232 |
| **MSN:** 00580 | **Tab No.:** |
| **A/C Del. Date:** December 2007 | **Lessee:** LTE |

**Bill To Contact:** Technical Services

Dave Mesic
Tel: (949) 219-4670
Fax: 949-759-5675
Email: dave.mesic@aviationcapital.com

**SHIP TO:**
Coordinate with LTE on engine logistics
Victor Manuel Fernandez
+34 971 70 6676
victor.fernandez@lte.com

**Vendor Name and Address:**

Ishikawajima-Harima Heavy Industries Co., Ltd
229 Tonogaya, Mizuho-machi, Nishitama-gun
Tokyo  190-1297

**Vendor Contact:**

Manager, Sales Group, Maintenance Dept
Tel: +81-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
Fax: +81-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

| Part Number | Qty. | Unit | Description | Unit Price | Total Price* |
|---|---|---|---|---|---|
| /2527-A5 SN /10154 | 1.00 | Each | Perform Engine Shop Visit in accordance with LTE workscope dated 9/7/07 | $0.00 | $0.00 |
| /2527-A5 SN /10155 | 1.00 | Each | Perform Engine Shop Visit in accordance with LTE workscope dated 9/7/07 | $0.00 | $0.00 |

*reasonable shipping applies

**Notes:**
- **Work shall be performed under Agreement No. ACG/IHI/V2500/01**
- in accordance with Lessee's approved maintenance program, V2500 Engine Manual an
  workscope recommendations of the IAE V2500 eMMP
- Workscope revisions shall be agreed upon by ACG and LTE

| | |
|---|---|
| Sub Total: | $0.00 |
| Freight: | $0.00 |
| Fees: | $0.00 |
| Tax: | $0.00 |
| Total: | $0.00 |

Approved By _____   Date: 12/13/2007      Issued By _____   Date: 12/13/2007

Robin Elliott